IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| ADEL FRANCIS MOUAWAD, | : |
| Petitioner, | : |
| | CIVIL ACTION NO. 15-0007-CG-C |
| vs. | : |
| | CRIMINAL NO. 13-0217-CG-C |
| UNITED STATES OF AMERICA, | : |
| Respondent. | |

## REPORT AND RECOMMENDATION

This cause is before the Court on petitioner Adel Francis Mouawad's motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255 (Doc. 41) and the testimony of one of Mouawad's retained attorneys, Richard R. Williams, Esquire, during the June 29, 2015 evidentiary hearing conducted in this matter (*see* Docs. 48 & 52). This action has been referred to the undersigned for entry of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Following consideration of all relevant pleadings in this case, and the evidentiary hearing testimony, it is recommended that Mouawad's § 2255 motion be **GRANTED** and that he be resentenced.

## PERTINENT FACTUAL BACKGROUND

On September 25, 2013, Mouawad was charged in a two-count indictment with laundering money, in violation of 18 U.S.C. § 1956(a)(3)(B),[1] and failing to file a "'Report of Cash Payments Over $10,000 Received in a Trade or Business[,]'" in violation of 31

---

[1] The conduct underlying Count One is alleged to have occurred on May 7, 2013. (Doc. 1, at 1.)

U.S.C. § 5331.[2] (Doc. 1, at 1-2.) These charges arose as the result of an undercover "sting" operation conducted by agents with the Internal Revenue Service ("IRS"). Indeed, almost ten months prior to the indictment and approximately five months prior to the actual money laundering and failure to report, that is, on December 12, 2012, the following conversation was surreptitiously recorded by an undercover agent:

>Mouawad:   Okay, man. Tell me what you have in mind.
>
>UCA:  Basically, here's the deal. These guys are making a shitload of money. More than they thought. We opened up a line in Chicago, and they're moving a lot of kilos up there. They're making a lot of money. They get kilos really cheap down here?
>
>Mouawad:   What?
>
>UCA:  They get kilos, coke-
>
>Mouawad:   I don't deal with this.
>
>UCA:  I don't deal with it either. What I'm dealing with is the money that's coming from it. That's how I get paid. So what I need to do is find a way to get this going to where you're taking my money like Mike told you and I just gotta make it look cool.
>
>Mouawad:   So how much money you wanna spend?
>
>UCA:  Oh, in the beginning, I'm thinkin' 40, 50, to see how it works out.
>
>Mouawad:   40, 50.
>
>UCA:  And then go from there.
>
>Mouawad:   So, uh, what you want, you want me invest, I mean in what [U/I]. Pawn shop is good business. You don't like pawn shop?
>
>UCA:  You own a pawn shop?
>
>Mouawad:   What?

---

[2] This failure to report was linked to May 22, 2013. (*See* Doc. 1, at 1.)

> UCA:  Do you own a pawn shop?
>
> Mouawad:    I can open one.
>
> UCA:  You can open one? I know Pawn Stars on . . .
>
> Mouawad: What?
>
> UCA:  I know Pawn Stars on the History channel. I don't even understand how that works.
>
> Mouawad:    You don't?
>
> UCA:  I mean I don't know how they make money they buy stuff for $30 and sell it for $100.
>
> Mouawad:    No I mean somebody needs money, you pawn a rings let's say $2000 ring you're paying 200 on it. I may have to claim it that's the way that goes.
>
> UCA:  How much start up does that cost then?
>
> Mouawad:    To start it takes about $100,000 at least but 50 would work you know to start off.
>
> UCA:  Well 50, I would like to get a nice ride to be honest. Like I said[,] you get me a nice sled, and I can, we could buy sleds for a while until we figure out okay what's the next steps.

(Government's Evidentiary Hearing Exhibit 1.) This conversation is replete with "maybes" and "what if's," there being absolutely no agreement, or anything approaching agreement, that $100,000 was going to be "funneled" to Mouawad to "clean" by purchasing a pawn shop. (*Id.*) Indeed, the undercover agent was interested neither in the purchase of a pawn shop or giving Mouawad $100,000 of purported drug money to launder; instead, the agent was interested in laundering at most $50,000 through Mouawad by purchasing "sleds," that is, cars. (*Id.*) Moreover, Mouawad's mere mention of $100,000 quickly "fell" to $50,000 in the same sentence, the smaller amount specifically being acknowledged by the agent. (*Id.*)

Mouawad entered a counseled guilty plea to Count One of the Indictment on December 19, 2013 (*see* Doc. 43, Guilty Plea Transcript), and, as the Factual Resume establishes, the undercover agent had a second conversation with petitioner on May 7, 2013 (Doc. 23, Factual Resume, at 4), which served as the basis for the money laundering charge set forth in Count One (*see* Doc. 1, at 1).

> During the meeting, the UCA provided Mou[a]wad with $25,000 in U.S. currency as well as information about the type of vehicle he wanted to purchase. Mouawad co[u]nted the cash inside the trailer which is used as an office at the business. He then took the cash into another room within the trailer.
>
> UCA told Mouawad that he did not want to spend more than $35,000 for the vehicle. UCA also told Mouawad that he did not want any government paperwork filed in his name relating to the cash payment. Mouawad agreed to do this. Mouawad said that he would advise UCA when he found a vehicle meeting his requirements. It was agreed that the UCA would provide Mouawad with the additional amount owed, if any, at the time he took possession of the vehicle.
>
> .   .   .
>
> On July 16, 2013, a second undercover IRS agent (UCA2) posing as a friend of UCA, met with Mouawad at an auto auction in Pensacola, Florida. UC[A]2 was accompanied by another undercover IRS agent posing as UCA2's friend. Mouawad had been told by UCA that he had suffered a back injury and was unable to travel to the auction. He told Mouawad that UCA2 would pick out the vehicle on his behalf.
>
> UCA2 picked out a vehicle at the auction on behalf of UCA. The vehicle was purchased at the auction by Mouawad for $20,580. Although UCA2 and UCA3 took possession of the vehicle in Pensacola, they met Mouawad at Triangle Auto Sales in Mobile later that day for the purpose of complet[]ing paperwork relating to the transaction. Mouawad generated a bill of sale indicating that the vehicle was sold to UCA2 although it was clear throughout the transaction that UCA was the actual purchaser of the vehicle and the one who would drive it. The bill of sale was signed by Mouawad.
>
> The bill of sale for the vehicle reflects a sale[s] price of $21, 495, and it was signed by Mouawad. Mouawad actually kept the entire $25,000 initially provided to him by UCA. Therefore, the paperwork prepared by

Mouawad in connection with this transaction did not accurately reflect the amount of income he received from the sale.

(*Id.* at 4-5, 5 & 5-6.) As the Guilty Plea Transcript reflects, Mouawad specifically admitted that the government could prove the money laundering charge and all facts set forth in the factual resume (Doc. 43, at 15 & 17), including, of course, that he had the conversation with the undercover agent on December 12, 2012 (*compare id.* at 15 *with* Doc. 23, Factual Resume, at 3-4), as is been set out in its entirety hereinabove (*see* Government's Evidentiary Hearing Exhibit 1).

The Guilty Plea Transcript also includes the following exchange between the Court and Mr. Mouawad:

> THE COURT:   All right. Now, for each of you, the United States Sentencing Commission has issued sentencing guidelines for judges to consider when determining the sentence in a criminal case. Have you and your attorney talked about how the sentenc[ing] guidelines might affect your sentence?
>
> DEFENDANT MOUAWAD:   Yes, ma'am.
>
> .   .   .
>
> THE COURT:   Do you understand that the Court will not be able to determine the advisory guideline sentencing range for your case until after the probation office has prepared a presentence report and you and the government have had the opportunity to challenge the reported facts and the application of the guidelines recommended by the probation office, and that the guideline range determined by the Court, and the ultimate sentence, may be different from any estimate your attorney or anyone else might have given you in this case?
>
> DEFENDANT MOUAWAD:   Yes, ma'am.
>
> .   .   .
>
> THE COURT:   And do you further understand that *after* your guideline range has been determined, the Court has the authority in some circumstances to depart either upwards or downwards from that range and will also consider other statutory factors that may result in the

>   imposition of a sentence that is either greater than or lesser than that called for by the guidelines?
>
>   DEFENDANT MOUAWAD:     Yes, ma'am.

(Doc. 43, at 11, 11-12 & 12 (emphasis supplied).)

According to Richard Williams, Esquire, one of Mouawad's retained attorneys, he was well aware of the importance of the guidelines being properly calculated, separate and apart from substantial cooperation and downward departures, consistent with the just quoted portion of Mouawad's Guilty Plea Proceeding. Indeed, defense counsel had identified no reason that the sentencing judge would not "go along" with the agreement between the parties for a low-end guidelines sentence (Doc. 23, at ¶ 19 ("The United States will recommend to the Court that the defendant be sentenced at the low end of the advisory sentencing guideline range as determined by the Court."); *see also id.* at ¶ 20.g. ("If the defendant's effort to cooperate with the United States does not amount to substantial assistance as determined solely by the United States, the United States agrees to recommend that the defendant receive a sentence at the low end of the advisory guideline range.")), thereby making it critical to find the appropriate low-end range.[3] In recognition of the importance of proper calculation of the guidelines, Williams filed specific objection to paragraph 36 of the presentence investigation report ("PSI") on June 2, 2014:

>   The Defendant objects to paragraph 36 (Base Offense Level) whereby the Probation Officer holds the Defendant accountable for an additional $100,000, indicating that the Defendant implied that this amount would be needed or necessary to open a pawn shop for money

---

[3] In other words, it obviously behooves a defendant to have the guidelines as low as possible before asking the Court to entertain other reasons to mitigate the sentence.

> laundering. The Defendant would aver that the discussions between the governmental agent and the Defendant never rose to a level of possible actual deeds to be performed by any of the parties but were mere discussions of possibilities and should not be included as relevant conduct.

(Doc. 28, at 1.) The objection was stricken by the Court the very day it was filed due to defense counsel's failure to follow the Court's procedure by including within his pleading "the required certification concerning conferring with opposing counsel and the Probation Office to resolve the matter." (Doc. 29.) Although the pleading was stricken from the record, the Court noted that the defendant could re-file his pleading "once the proper certification is made." (*Id.*) Despite the fact that the sentencing hearing did not take place until more than six weeks after June 2, 2014, specifically on July 18, 2014 (*see* Doc. 44), Williams, through oversight, did not re-file this objection with the proper certification (*see* Defendant's Evidentiary Hearing Exhibit 1, Affidavit of Richard R. Williams ("I cannot articulate a reason why the objection never was re-filed or raised again; apparently it was an oversight.")) and counsel for Mouawad failed to interpose any objection to the presentence report at sentencing on July 18, 2014 (Doc. 44, Sentencing Transcript, at 2 (Williams and Michael R. Kaoui both indicated that there were no objections to the presentence report and Williams specifically informed the Court that there were no objections to the Court's findings that Mouawad's total offense level was 23 with a criminal history category of I)).

The significance of Williams' oversight cannot be overlooked inasmuch as Mouawad's base offense level of 8 under the appropriate sentencing guidelines, that is, USSG § 2S1.1, was increased by 10 levels—instead of 4 levels—because the defendant was held accountable for the "$100,000 [] the defendant indicated would be necessary to open a pawn shop for money laundering." (*See* Doc. 32, ¶ 36.)

> [S]ection [2S1.1 of the guidelines] provides that because there is no specific amount of drugs known in the money laundering offense, pursuant to USSG § 2S1.1(a)(2), the offense level is 8 plus the number of offense levels from the table in § 2B1.1 corresponding to the *value of the laundered funds*. The investigation determined that the defendant was involved in the *actual laundering of more than $10,000 but $30,000 or less*. Relevant conduct also holds the defendant accountable for an additional $100,000 that the defendant *indicated* would be necessary to open a pawn shop for money laundering. Pursuant to USSG 2B1.1(b)(1)(F), because the *value of the laundered funds* was more than $120,000 the base offense level is increased by 10 levels. The total base offense level is 18. USSG §2S1.1(a)(2).

(*Id.* (emphasis supplied).) As the Probation Office correctly referenced, USSG §2S1.1(a)(2) provides for a base offense level of 8 "plus the number of offense levels from the table in § 2B1.1 . . . corresponding to the *value of the laundered funds*[.]" (*Id.* (emphasis supplied).) Section 2B1.1, in turn, provides for a 4-level increase where such value is more than $10,000 but less than $30,000 and a 10-level increase where the value of the laundered funds is more than $120,000. USSG § 2B1.1(b)(1)(C) & (F). So, as pointed out by petitioner's counsel, the Probation Office's utilization of the 10-level increase (rather than a 4-level increase) "drove" the sentencing in this case. And it was vital for defense counsel to challenge this interpretation of the sentencing guidelines, as reflected by counsel's procedurally-defective objection (Doc. 28), given the definition of "laundered funds" contained in the Application Notes of § 2S1.1 of the sentencing guidelines, *see* USSG § 2S1.1, Application Notes, Definitions ("*'Laundered funds' means the **property, funds, or monetary instrument involved in the transaction, financial transaction, monetary transaction, transportation, transfer, or transmission in violation of 18 U.S.C. § 1956 or § 1957.***" (some emphasis supplied)), as well as the error by the Probation Office in morphing an "indicated" amount of funds/money (that is,

8

the "indicated" $100,000^4$) into "laundered funds" (*see* Doc. 32, ¶ 36 ("Pursuant to USSG 2B1.1(b)(1)(F), because the value of the laundered funds was more than $120,000 the base offense level is increased by 10 levels.")). In other words, given that the "indicated" $100,000 (or $50,000) was never involved in any transaction, transportation, transfer, or transmission (or that such funds even existed), it was vital for defense counsel to press the objection initially found procedurally deficient by the Court to enable the Court to properly calculate the sentencing guidelines based on Mouawad's total offense level, with a criminal history category of I, and the parties' agreement for a low-end guidelines recommendation by the government. Nevertheless, an objection that Richard Williams, Esquire admitted on June 29, 2015, that should have been re-filed and made (*see also* Defendant's Evidentiary Hearing Exhibit 1, *supra* ("I neither re-filed it with the proper certification, nor did I or my co-counsel, Michael Kaoui, raise the objection at the sentencing hearing[.] . . . [I]t was the clear intent of myself, Mr. Kaoui, and Mr. Mouawad to challenge the relevant conduct calculation in the PSR."); *compare id. with* Defendant's Evidentiary Hearing Exhibit 2, Affidavit of Michael R. Kaoui ("It was my professional opinion that the relevant conduct calculation should not have included the $100,000 figure. . . . [I]t was the clear intent of myself, Mr. Williams, and Mr. Mouawad to challenge the relevant conduct calculation in the PSR.")) was not re-filed and made because of oversight.

---

[4] The $100,000 "value" reported by the Probation Office is also questionable because in the course of the same sentence of the recorded conversation between Mouawad and an undercover agent, the $100,000 became $50,000 and it is clear from the context of the entire conversation that the agent was not at all interested in giving Mouawad anywhere near the hypothetical $100,000 to launder. Indeed, the undercover agent clearly rejected Mouawad's idea about a pawn shop and only wanted to launder money by purchasing cars.

The parties stipulated during the evidentiary hearing conducted on June 29, 2015 that had the foregoing objection been successfully argued in this case at sentencing (or prior thereto), Mouawad's total offense level would have been 17, and given the defendant's criminal history category of I, the guideline range would have been 24 to 30 months, *see* Sentencing Table. In light of the provisions of the plea agreement, and there being no reason to expect the Court to upwardly depart from the guideline range, it is likely Mouawad's sentence would have been 24 months. Even though the Court, at Mouawad's sentencing, did depart downward from the guideline range—for a total offense level of 23 with a criminal history category of I the guideline range was 46 to 57 months, *see* Sentencing Table—to a sentence of 38 months (*see* Doc. 44, at 14), 38 months is, obviously, significantly higher than 24 (or even 30) months.

Mouawad did not appeal the July 21, 2014 judgment (*see* Docket Sheet); instead, on December 29, 2014, petitioner filed the instant motion to vacate his sentence (*see* Doc. 41, at 7 (Mouawad's certification that he placed his motion to vacate in the prison mailing system on December 29, 2014)). As reflected in the undersigned's May 7, 2015 Order, the sole claim raised by Mouawad in his motion to vacate is that his trial attorney "provided ineffective assistance in failing to properly object . . . to the relevant conduct reference in the Presentence Investigation Report . . . on the basis that the referenced $100,000 did not constitute funds that were 'actually laundered[.]'" (Doc. 48, at 1 & 2.)

### CONCLUSIONS OF LAW

Section 2255 reads, in relevant part, as follows: "A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or

laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). In this instance, Mouawad's sole contention is that the sentence he received was higher than it otherwise would have been because of constitutionally ineffective assistance of counsel. (*See* Doc. 41.)

The Sixth Amendment gives criminal defendants the right to effective assistance of counsel. U.S. Const. amend. VI; *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "To establish an ineffective assistance of counsel claim, a defendant must show that (1) 'counsel's representation fell below an objective standard of reasonableness' and (2) that such failure prejudiced him in that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *United States v. Pease*, 240 F.3d 938, 941 (11th Cir.) (per curiam) (quoting *Strickland*, 466 U.S. at 688 & 694, 104 S.Ct. at 2064 & 2068), *cert. denied*, 534 U.S. 967, 122 S.Ct. 381, 151 L.Ed.2d 290 (2001). "'Conclusory allegations of ineffective assistance are insufficient[,]'" *Wilson, supra*, 962 F.2d. at 998 (quoting *United States v. Lawson*, 947 F.2d 849, 853 (7th Cir. 1991)); *see also Rosado v. Secretary, Dep't of Corrections*, 2010 WL 2976886, *4 (M.D. Fla. Jul. 20, 2010) ("[V]ague, conclusory, speculative, or unsupported claims cannot support an ineffective assistance of counsel claim."), and  "[b]ecause both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa." *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir.) (citation omitted), *cert. denied,* 531 U.S. 1017, 121 S.Ct. 578, 148

L.Ed.2d 495 (2000); *see also Osley v. United States*, 751 F.3d 1214, 1222 (11th Cir. 2014) ("A habeas petitioner claiming ineffective assistance of counsel must carry his burden on both *Strickland* prongs, and a court need not address both prongs if the defendant has made an insufficient showing on one."); *Adamson v. United States,* 288 Fed.Appx. 591, 594 (11th Cir. Jul. 29, 2008) ("The defendant must satisfy both prongs of this test to show a Sixth Amendment violation; if the defendant fails to demonstrate one of these prongs sufficiently, we do not need to address the other."), *cert. denied,* 555 U.S. 1010, 129 S.Ct. 526, 172 L.Ed.2d 385 (2008); *Butcher v. United States*, 368 F.3d 1290, 1293 (11th Cir. 2004) ("[O]nce a court decides that one of the requisite showings has not been made it need not decide whether the other one has been.").[5]

The *Strickland v. Washington* standard for evaluating claims of ineffective assistance of counsel was held applicable to guilty pleas in *Hill v. Lockhart*, 474 U.S. 52, 58, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985). The Eleventh Circuit has held that "'counsel owes a lesser duty to a client who pleads guilty than to one who decides to go to trial, as in the former case counsel need only provide his client with an understanding of the law in relation to the facts, so that the accused may make an informed and conscious choice between accepting the prosecution's offer and going to trial.'" *Carter v. United States,* 288 Fed.Appx. 648, 649 (11th Cir. Aug. 4, 2008), quoting *Wofford v. Wainwright,* 748 F.2d 1505, 1508 (11th Cir. 1984). Moreover, in the context of sentencing following

---

[5] Given the two-prong nature of the test for adjudicating ineffective-assistance-of-counsel claims, it can come as no surprise that "'the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between.'" *Johnson v. Alabama,* 256 F.3d 1156, 1176 (11th Cir. 2001) (citation omitted), *cert. denied sub nom., Johnson v. Nagle,* 535 U.S. 926, 122 S.Ct. 1295, 152 L.Ed.2d 208 (2002).

entry of a guilty plea, the court simply considers whether petitioner has established, in accordance with *Strickland, supra,* that his attorney was deficient and that he was prejudiced by this deficiency in performance. *See, e.g., Myers v. United States,* 2009 WL 1505638, *1 (W.D. Pa. May 12, 2009) ("In order for petitioner to succeed on an ineffective assistance of counsel claim, he must prove: (1) that his counsel was deficient; and (2) that he was prejudiced by his counsel's deficiency."), *aff'd,* 364 Fed.Appx. 769 (3rd Cir. 2010), *cert. denied,* ___ U.S. ___, 131 S.Ct. 1026, 178 L.Ed.2d 848 (2011).

> The performance prong of the ineffective assistance standard entails a deferential review of counsel's conduct. In assessing the reasonableness of counsel's performance, courts must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.[6] Thus, the Sixth Amendment does not require criminal defense attorneys to take a nothing to lose approach and raise every available nonfrivolous defense.
>
> With respect to prejudice, courts ask whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

*Means v. Secretary, Department of Corrections,* 433 Fed.Appx. 852, 855 (11th Cir. Jul. 12, 2011) (internal quotation marks and citations omitted; footnote added), *cert. denied sub nom. Means v. Tucker,* ___ U.S. ___, 132 S.Ct. 1580, 182 L.Ed.2d 198 (2012); *see also Pair v. Cummins,* 373 Fed.Appx. 979, 981-982 & 982 (11th Cir. Apr. 20, 2010) ("The performance prong of an ineffective assistance claim requires the petitioner to show that, considering all the circumstances, his attorney's representation fell below an objective standard of reasonableness. The standard is that of a reasonable attorney, not a paragon of the bar

---

[6] In order to satisfy the first prong, "the petitioner must establish that no competent counsel would have taken the action that his counsel did take[.]" *Hall v. Thomas,* 611 F.3d 1259, 1290 (11th Cir. 2010) (quotation marks and citation omitted).

or an Aristotle or a Clarence Darrow. Moreover, judicial review of an attorney's performance is highly deferential, and the court must eliminate the distorting effects of hindsight and evaluate performance from the attorney's perspective at the time the challenged conduct occurred. In so doing, the court must indulge a strong presumption that the attorney's conduct was objectively reasonable. A petitioner fails to overcome that presumption if the challenged conduct might be considered sound trial strategy. . . . Pair must [also] establish prejudice. It is not enough for him to show that his counsel's deficient performance had some conceivable effect on the jury's verdict. Instead, Pair must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (internal quotation marks and citations omitted)); *Brownlee v. Haley*, 306 F.3d 1043, 1059-1060 (11th Cir. 2002) ("In evaluating the first, or 'performance,' prong of *Strickland,* '[j]udicial scrutiny of counsel's performance must be highly deferential.' Because retrospective evaluation of a lawyer's performance can be difficult, 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that ... the challenged action might be considered sound trial strategy.' A petitioner must identify specific acts or omissions that were not the result of reasonable professional judgment, and a court should deem these acts or omissions deficient only if they 'were outside the wide range of professionally competent assistance.' Simply put, the deference afforded an attorney's decision is great and the bar for proving a Sixth Amendment violation is high. In light of the 'strong presumption in favor of competence,' we have held that in order to prove deficient performance, 'a petitioner must establish that no competent

counsel would have taken the action that his counsel did take. Under the second, or 'prejudice,' prong of Strickland, a petitioner must 'affirmatively prove prejudice' by showing that counsel's errors 'actually had an adverse effect on the defense.' This requires a showing of more than 'some conceivable effect on the outcome of the proceeding.' Instead, the petitioner 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' Although this standard is difficult to meet, it is significant that a petitioner must show only a reasonable probability that the outcome would have been different; he 'need not show that counsel's deficient conduct more likely than not altered the outcome in the case.' When evaluating this probability, 'a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.'" (internal citations omitted).)

"[F]ailure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under § 2255." *Massaro v. United States*, 538 U.S. 500, 509, 123 S.Ct. 1690, 1696, 155 L.Ed.2d 714 (2003). Indeed, "in most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance." *Id.* at 504, 123 S.Ct. at 1694; *see also United States v. Curbelo*, 726 F.3d 1260, 1267 (11th Cir. 2013) ("An ineffective assistance claim should usually be raised in a motion under 28 U.S.C. § 2255."), *cert. denied*, 134 S. Ct. 962, 187 L.Ed.2d 822 (2014).

This is the rare case referenced in *Johnson v. Alabama, supra,* because Mouawad should prevail on his ineffective assistance of counsel claim and be resentenced. Contrary to the government's argument at the evidentiary hearing, the undersigned

finds that no competent attorney would have failed to re-file objection to paragraph 36 of the PSI—following the striking of the initial written objection for failure to follow the Court's certification procedure—given the Court's invitation to re-file same upon proper certification (Doc. 29) and the ample time—some 6 weeks—left before sentencing in which to re-file the pleading, counsel's clear recognition that the Court's proper calculation of the sentencing guidelines and Mouawad's base offense level was critical, and counsel's recognition that the "$100,000 relevant conduct" was driving "up" his client's base offense level and the sentencing guidelines and needed to be attacked because the discussions about the "$100,000 . . . never rose to a level of possible actual deeds to be performed by any of the parties but were mere discussions of possibilities and should not be included as relevant conduct[]" (Doc. 28). In other words, it is apparent from defense counsel's procedurally-deficient June 2, 2014 objection to paragraph 36 of the PSI that counsel recognized that there was a disconnect between the contents of paragraph 36 of the PSI and the relevant sentencing guidelines in USSG §§ 2S1.1(a)(2) and 2B1.1(b). Because this "disconnect" was driving "up" Mouawad's base offense level and the sentencing guidelines, Williams' oversight in failing to re-file his objection to paragraph 36 of the PSI simply cannot be overlooked by the Court. Accordingly, the undersigned recommends that the Court conclude that defense counsel's omission in the manner just described fell outside the wide range of professionally competent assistance and, therefore, constitutes constitutionally deficient performance.

The undersigned also recommends that the Court find that a reasonable probability exists that but for counsel's unprofessional omission (or error) in failing to re-file objection to paragraph 36 of the PSI, the result of petitioner's sentencing

proceeding would have been different. The pertinent sentencing guideline definitions discussed above in some detail clearly confine "laundered funds" (those "laundered funds" determining how many levels above 8 a defendant's base offense level will rise) to actual monies involved in some type of transaction or transfer, not hypothetical funds or monies mentioned in conversation that are never a part of a concrete transaction or transfer and are not laundered. The Eleventh Circuit, in *United States v. Paley*, 442 F.3d 1273 (2006), drove this interpretation home, in first observing that "[i]n 2001, [] § 2S1.1 was amended . . . [to] provide[] that the 'value of the *laundered* funds' should be used in determining the offense level[]" and then specifically finding that ***"the inclusion of the modifier 'laundered' before 'funds' indicates that the funds which should be considered for sentencing purposes are those that were actually laundered.***" *Id.* at 1277 & 1278 (some emphasis supplied); *cf. United States v. Pizano,* 421 F.3d 707, 727 & 728 (8th Cir. 2005) ("[W]e hold that in a money-laundering offense involving layering, the 'value of the laundered funds' is the amount originally derived from criminal activity and then laundered, not the aggregate total of the funds involved in each layer. . . . The 2001 amendments to § 2S1.1 convince us that the 'value of the laundered funds' should be limited to funds originally injected or infused into the money-laundering scheme."), *cert. denied,* 546 U.S. 1204, 126 S.Ct. 1409, 164 L.Ed.2d 108 (2006); *United States v. Astronomo,* 183 F.Supp.2d 158, 183-184 (D. Mass. 2001) (trial court refused to count as relevant conduct in money laundering case amounts mentioned in ongoing negotiations but never laundered and the $50,000 to $100,000 figure mentioned in other preliminary negotiations but never laundered—only counting the $38,000 that was laundered). Accordingly, the undersigned can read *Paley* in only one manner and that is to find that had this issue been properly presented by defense counsel, this Court would have been

17

in no position other than to determine that it could not consider for sentencing purposes the $100,000 (for opening a pawn shop) Mouawad referenced once in a conversation with an undercover agent—which quickly lowered to $50,000 in the course of a few words—because the referenced $100,000 was not "actually laundered," as was recognized in the PSI (Doc. 32, at ¶ 36 ("The investigation determined that the defendant was involved in the *actual laundering of more than $10,000 but $30,000 or less*. Relevant conduct also holds the defendant accountable for an additional $100,000 that the defendant *indicated* would be necessary to open a pawn shop for money laundering.")). In absence of the $100,000, Mouawad's base offense level properly would have been calculated as 12 (as opposed to 18) and, as the parties agree, his total offense level would have been 17, which renders a sentencing range of 24 to 30 months. *See* Sentencing Table. Given the agreement between Mouawad and the government that the government would recommend a low-end sentence, the undersigned recommends that the Court conclude that but for defense counsel's failure to re-file his objection to paragraph 36 of the PSI, Mouawad would have received a sentence of 24 months, a sentence significantly less than the 38 months he received. In other words, because Mouawad would have received a lesser sentence but for his counsel's failure to re-file objection to paragraph 36 of the PSI, the prejudice prong set forth in *Strickland* and *Hill v. Lockhart, supra,* has been established.

## CONCLUSION

In light of the foregoing, the Magistrate Judge recommends that the instant motion to vacate (Doc. 41) be **GRANTED** and that Adel Francis Mouawad be resentenced.

## NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72(b); S.D.ALA. L.R. 72.4. The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this the 6th day of July, 2015.

                                    s/WILLIAM E. CASSADY
                              **UNITED STATES MAGISTRATE JUDGE**